

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00526-CR

Delridge Jermaine **CLARK**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR1658
Honorable Maria Teresa Herr,[1] Judge Presiding

Opinion by:      Luz Elena D. Chapa, Justice

Sitting:         Sandee Bryan Marion, Chief Justice
                 Luz Elena D. Chapa, Justice
                 Jason Pulliam, Justice

Delivered and Filed:  November 2, 2016

AFFIRMED

Delridge Jermaine Clark was convicted by a jury of two counts of assaulting a public servant. On appeal, Clark argues (1) the evidence is legally insufficient to support the jury's implicit rejection of his self-defense claim, and (2) the trial court erred by failing to order a new array after the State unlawfully exercised a peremptory strike. We affirm the trial court's judgments.

---

[1] Sitting by assignment.

**BACKGROUND**

On the Saturday night before Christmas in 2013, Clark went shopping at Walmart in Converse, Texas. Clark purchased toothpaste and a can opener and then left the store. After driving away, Clark realized his cell phone was missing. He returned to Walmart to search for his phone.

When Clark was searching the parking lot, he was approached by William Scogins and William Sutton. Scogins and Sutton are certified peace officers who were providing security for Walmart. Star Coffman, a Walmart employee who was working in the store's asset protection office, suspected Clark had stolen some items from the store. Coffman informed Scogins and Sutton of his suspicion sometime before Scogins and Sutton approached Clark in the parking lot.

After approaching him, Scogins asked Clark whether he stole any items from the store. In response, Clark gave Scogins and Sutton permission to go to the car he was driving and search it. Clark, Scogins, Sutton, and Coffman walked to the car. Clark entered the car, and Scogins, Sutton, and Coffman continued questioning Clark about the suspected theft.[2] After approximately five minutes, Clark started the engine, shifted the car's gear to reverse, backed out of the parking space, and drove away. Sometime during the incident, Sutton drew his service gun and shot Clark in the arm near his shoulder. Scogins and Sutton were also injured during the incident. Clark was arrested later that evening.

A grand jury indicted Clark for two counts of assaulting a public servant: one count for assaulting Scogins and the other for assaulting Sutton. Clark pled not guilty, and the case proceeded to a jury trial. During voir dire, Clark objected to the State's use of a peremptory strike on an African American juror. The trial court overruled his objection and the trial commenced. Scogins and Sutton testified for the State. They testified Clark backed his car into them without

---

[2] Clark, Scogins, and Sutton testified at trial. Clark's testimony conflicted with Scogins's and Sutton's testimony about what transpired during the incident in the parking lot.

provocation and before Sutton shot Clark. Although the State issued a subpoena for Coffman, he no longer worked for Walmart at the time of trial and he was not located. The trial court admitted several photographs of Scogins's and Sutton's injuries and video recordings showing Clark inside the Walmart store and in the parking lot.

Clark testified he was acting in self-defense, and he drove away only after Sutton, without provocation, put a gun against his head. The trial court admitted an audio recording of a phone call Clark made while in custody after his arrest, during which time he described the incident.

After receiving instructions, including an instruction on Clark's claim of self-defense, and hearing closing arguments, the jury found Clark guilty of both counts of assaulting a public servant. Clark requested the trial court assess punishment instead of the jury. The trial court sentenced Clark to twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Clark appeals.

## LEGAL SUFFICIENCY

Clark contends there is legally insufficient evidence to support the jury's implicit rejection of his self-defense claim. When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, we must determine whether a rational trier of fact (1) could have found the essential elements of the offense beyond a reasonable doubt and (2) also could have found against the defendant on the self-defense claim beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). We must review all of the evidence relevant to this issue in a light most favorable to the State. *See id.*

### A. The Evidence Relevant to Clark's Legal Sufficiency Challenge

Scogins testified he is a detective assigned to the Criminal Investigation Division of the City of Converse Police Department. He testified he has approximately thirty years of law

enforcement experience. Scogins stated he is a certified peace officer and, as a detective, he investigates criminal offenses. As a certified peace officer, he is permitted to work for a private company to provide security and has "a different set of rules or powers" than do security guards who are not certified peace officers. Scogins explained when he works an "off-duty job inside the city limits of Converse, [he's] required to wear the department-issued uniform and duty gear, to include all the patches [and his] assigned badge." He further explained this policy confers upon him the authority of the Converse Police Department when he works an off-duty job in Converse. Scogins stated he had received no reprimands during his thirty years in law enforcement for using excessive force or fabricating evidence.

Scogins also testified about the incident involving Clark. He testified he was wearing his badge and uniform during the incident. The trial court admitted photographs of Scogins wearing his badge and uniform while sitting in an ambulance after the incident. Scogins identified Clark as the individual who Coffman suspected of theft. Scogins stated Clark consented to a search of the car he was driving, and he and Sutton followed Clark to the car, which was parked in a handicap space. Scogins testified Clark entered the car and started the engine. He stated he asked Clark to turn off the car's engine, Clark complied, and they continued to discuss whether Clark stole any items from Walmart.

Scogins testified Sutton and Coffman were also by the car, and as Coffman informed Scogins what he believed Clark had stolen, Scogins "heard the keys jiggling." He testified he saw Clark "picking up the keys to start the motor of the car again." Scogins stated he repeatedly told Clark to put the keys back onto the floorboard and although Clark would initially comply, he continued to reach for the keys. He stated Clark started the car's engine and did not comply with Scogins's request to turn off the engine. According to Scogins, Clark looked at him, shifted the car's gear to reverse, "and immediately hit the accelerator."

Scogins further testified he was standing in between the open driver's side door and the car's passenger compartment as the vehicle accelerated backwards. He testified the driver's side door hit him on his upper rib cage. The trial court admitted two photographs depicting what Scogins testified was "deep tissue bruising" on his upper rib cage. Scogins testified his only option when the door hit him "was to grab ahold of the door." He explained he was pinned against the edge of the driver's side of the passenger compartment due to the vehicle's physical force. The trial court admitted a photograph showing creases in the right side of Scogins's uniform he testified were caused by being pinned against the passenger compartment and being dragged by the car. Scogins explained he "could feel [his] feet under the door striking where that wheel was" and he felt a lot of pain in his left leg. The trial court admitted photographs showing bruises to Scogins's left upper arm and a scrape and bruises on his leg.

Scogins testified Clark stopped the car and shifted the gear to drive forward. He testified he heard a gunshot when Clark started to drive forward through the parking lot. Scogins explained Clark's car started to drive to the left and slow down and "as it started drifting to the left, [he] released [his grip on the car]." He stated he hit his right shoulder when he released his grip on the car. The trial court admitted photographs showing the right shoulder of Scogins's uniform was torn and bruising and marks on his shoulder. Scogins testified Clark then drove away. The trial court admitted more photographs taken three days after the incident showing subsequent bruising to the inside of Scogins's left arm and the healing of the scrape on his left leg. Scogins stated a doctor informed him the bruising on his leg "will never go away."

Scogins denied threatening to "plant some items" on Clark and threatening "to blow [Clark's] F'ing brains out." Scogins further denied Clark drove the car in reverse to avoid being shot. He stated Clark put the car in reverse after he asked Coffman whether Walmart wanted to

prosecute Clark. Scogins denied he "threw [his] body across [Clark] to stop him." He further denied Sutton reached into the car and put a gun against Clark's head.

The trial court admitted into evidence a compact disc containing video recordings of inside of the Walmart store and footage of the parking lot. One of the video recordings was taken from a rooftop camera that faced out toward several rows of parking lot spaces. A portion of that video recording shows a car pulled into what appears to be a handicap space. This video recording also shows four individuals walked toward the car approximately eight minutes after the car was parked. On the video recording, two individuals approached the car's driver's side and then went out of the camera's view; the other two individuals generally remained in the camera's view. Approximately five minutes after the four individuals approached the car, one of the two individuals who remained in the camera's view was behind the car and the other was to its left. The video recording shows the car's taillights activated; the car reversed out of the parking space, apparently backing into the individual standing behind it; the car stopped; the car then moved forward and veered to the left before stopping again; the car then drove away, leaving behind what appears to be one of the four individuals lying on the ground.[3] No audio accompanies the video recordings.

Sutton testified he is employed as a deputy corporal at the City of Schertz's Marshal's Office. At the marshal's office, Sutton's primary duties include providing security at the court and at city council meetings. He testified he had, at the time of trial, approximately twelve years of law enforcement experience. Sutton stated he is a certified police officer who has firearms and use-of-force training. He stated he sometimes works off-duty jobs providing security and, when he does

---

[3] During trial, some witnesses referred to time stamps on the video recording. The video recordings contained in the record do not contain the time stamps to which the witnesses were referring.

he wears his badge and uniform and acts in his official capacity while doing so. Sutton testified he had not received any reprimands as a law enforcement officer.

Sutton further testified he was providing security at Walmart during the incident with Clark. He testified he was providing "cover" for Scogins while Scogins was questioning Clark. Sutton stated he was standing immediately behind the car when he saw the taillights activate. He stated he used his "hands to try to push off [the] vehicle," and he saw Scogins was caught "in the door frame and . . . being drug backwards." Sutton also stated he took his "duty weapon" and raised it toward Clark and yelled, "Police, stop." Sutton explained he fired his gun at Clark once, but did not see whether Clark had been hit.

Sutton testified he felt severe pain in his left foot as a result of the incident. He testified he was treated at an emergency room, where he learned his foot was fractured. Sutton stated he also had foot surgery because he was unable to move his foot and a "bone on the inside . . . was chipped off." The trial court admitted photographs of Sutton's foot taken the day of surgery. Sutton stated he is in constant pain and his foot throbs "every single day." Sutton also stated Scogins did not jump inside the vehicle. Sutton denied putting the gun against the temple of Clark's head. He testified he pointed the gun at Clark but the gun "was not up against any body part." Sutton further testified his use of force was investigated, but the investigators concluded the shooting was justified.

Clark testified in his defense. He stated "two cops" approached him in the parking lot. Clark testified he consented to a search of his vehicle and when he went to unlock and open his door, Scogins "leaned against the door shutting it back." According to Clark, Scogins did not let him enter the car until Scogins searched him for drugs and weapons. Clark stated Scogins searched him and then permitted Clark to sit in the driver's seat. Clark also stated he started his car and turned up the radio, and Scogins "flipped out." He testified he turned off the car and placed the

keys on the floor board. Clark testified Coffman approached the car and he and Coffman had a "brief exchange." Clark stated Coffman and Scogins threatened his safety.

Clark further testified, "Scogins jumped in my car, and he landed across me like diagonally, like that, and I had my hand on the steering wheel." He testified Scogins did not say anything when he jumped on him. Clark stated he then put the car in reverse, but stopped because Sutton pressed a gun to the side of his head. He stated he "jerked back" and Sutton shot him in the shoulder. Clark explained the bullet came near his face, his face was burning, his eyebrow was singed, and it smelled "like sulfur and burnt toast." Clark testified Scogins fell out of the car before Clark drove away.

The trial court admitted an audio recording of a phone call Clark made after he was arrested. Clark explained the incident to the woman on the phone. He told her he was parked in a car in a Walmart parking lot and attempting to escape because the officers were discussing whether to frame him for theft. He explained the officers had searched his car and did not find anything. Clark explained he panicked because he was worried the car, which belonged to his sister, would be towed. He stated he shifted the car's gear to reverse and one of the officers jumped on him. He further stated, "When that happened, another cop jumped on him." Clark also stated when the second officer jumped in the car, the second officer drew his gun and put it against Clark's head. Clark explained he moved his head "just in time" and when the gun went off, it hit Clark's shoulder.[4]

---

[4] There was no evidence about whether Clark had stolen any items from the store. Clark denied he had stolen items from the store, and Scogins and Sutton did not find any stolen items in Clark's car. The State theorized Clark stole items from the store and left them at the house of the woman he called after he was arrested.

**B. Assault of a Public Servant**

Although Clark does not present a separate issue challenging the legally sufficiency of the evidence regarding any of the essential elements of the offenses for which the jury convicted him, *Saxton* instructs us to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See id.*; *see, e.g.*, *Valverde v. State*, 490 S.W.3d 526, 528 (Tex. App.—San Antonio 2016, pet. ref'd) (holding "evidence establishe[d] every essential element of murder beyond a reasonable doubt" although appellant did "not challenge the sufficiency of the evidence to support the jury's finding of the essential elements"). The essential elements of assault of a public servant, as charged by the indictment in this case, are (1) the defendant intentionally, knowingly, or recklessly causes bodily injury to another; (2) the person who sustained the bodily injury was a public servant; (3) the defendant knew the person who sustained the bodily injury was a public servant; and (4) the public servant was lawfully discharging his official duties when the defendant caused the bodily injury. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (West Supp. 2016); *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005). A defendant is "presumed to have known the person assaulted was a public servant, a security officer, or emergency services personnel if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant or status as a security officer or emergency services personnel." TEX. PENAL CODE ANN. § 22.01(d). Moreover, "a police officer's 'off-duty' status is not a limitation upon the discharge of police authority. And for many purposes, an officer is on duty 24 hours a day." *Polk v. State*, 337 S.W.3d 286, 288 (Tex. App.—Eastland 2010, pet. ref'd) (internal citations and quotes omitted).

Clark asserts in his brief, "No rational trier of fact would have found for the State on the underlying offense," but he does not argue or explain why there is legally insufficient evidence of any essential element of the offense. There is evidence Clark caused Scogins and Sutton to sustain

bodily injuries by backing the car into them. A rational trier of fact could have inferred from the evidence Clark intentionally, knowingly, or recklessly caused their injuries. Scogins and Sutton each testified he was a certified peace officer who was working in his official capacity when providing security to Walmart. There is also evidence Scogins and Sutton were wearing police department-issued uniforms and badges indicating their roles as security officers. Thus, the evidence supports a presumption Clark knew Scogins and Sutton were public servants. *See* TEX. PENAL CODE ANN. § 22.01(d). Furthermore, there is evidence Scogins and Sutton were, at the time when Clark backed the car into them, lawfully discharging their official duties of investigating a suspected criminal offense. We hold a rational trier of fact could have found the essential elements of both counts of assault of a public servant beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *see also* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1); *Hall*, 158 S.W.3d at 473. We must next determine whether a rational trier of fact also could have found against Clark on his self-defense claim beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

**C. Self-Defense**

A rational trier of fact can find against a defendant on his self-defense claim beyond a reasonable doubt if the defendant does not conclusively prove he acted in self-defense as a matter of law. *See Moralez v. State*, 450 S.W.3d 553, 567 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011).

A defendant's "testimony alone does not conclusively prove self-defense as a matter of law." *Moralez*, 450 S.W.3d at 567. If a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt the defendant's actions were not justified. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App.

2003); *Saxton*, 804 S.W.2d at 914. To meet its burden of persuasion, the State is not required to produce additional evidence. *Saxton*, 804 S.W.2d at 914. In determining whether the State has met its burden of persuasion, a jury is entitled to resolve any inconsistencies in the evidence, and is free to accept or reject some or all of any witness testimony. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Zuniga v. State*, 393 S.W.3d 404, 413 n.2 (Tex. App.—San Antonio 2012, pet. ref'd). A jury verdict of guilty is an implicit rejection of the defendant's self-defense claim. *Saxton*, 804 S.W.2d at 914.

We view all of the evidence in the light most favorable to the State and defer to the jury's determinations of witness credibility and the weight of the evidence. *See id.*; *see also Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, the appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"); *Zuniga*, 393 S.W.3d at 413 n.2. "As the sole judge of the weight and credibility accorded any witness's testimony, the jury is free to believe or disbelieve the testimony of all witnesses, and to accept or reject any or all of the evidence produced by the respective parties." *Cleveland v. State*, 177 S.W.3d 374, 380 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (en banc). Thus, when the evidence is conflicting as to the circumstances surrounding the defendant's use of force and whether the defendant's use of force in self-defense is justified, and the jury's implicit rejection is based on its determinations of witness credibility and the weight of the evidence, a jury can rationally find against the appellant on the self-defense claim beyond a reasonable doubt. *See Shannon v. State*, — S.W.3d —, No. 08-13-00320-CR, 2015 WL 6394922, at *5 (Tex. App.—El Paso Oct. 21, 2015, no pet.); *Johnson v. State*, 452 S.W.3d 398, 403 (Tex. App.—Amarillo 2014, pet. ref'd).

Clark argues his testimony proved he was threatened and shot before he backed his car out of the space and was therefore justified in using force. Clark's testimony alone does not

conclusively prove self-defense as a matter of law. *See Moralez*, 450 S.W.3d at 567. The jury was entitled to disbelieve Clark's suggestion that two certified peace officers, who had no reprimands for excessive force or fabricating evidence during a combined total of over forty years of law enforcement experience, spontaneously conspired with a Walmart employee to plant evidence of a crime on a customer and threatened to shoot the customer in the head because he had turned his radio up too loud. *See Chambers*, 805 S.W.2d at 461. Furthermore, Clark's account of the incident at trial conflicted with his account of the incident during the phone call he made hours after the incident; at trial he testified only Scogins jumped on him and, during the phone call, he stated two officers jumped into his car on top of him. *See Gaona v. State*, — S.W.3d —, No. 05-15-00541-CR, 2016 WL 3947378, at \*3 (Tex. App.—Dallas July 18, 2016, no. pet. h.) (noting discrepancies between defendant's trial testimony and prior statement supported holding jury rationally rejected defendant's self-defense claim).

Scogins's and Sutton's testimony about the circumstances surrounding the defendant's use of force contradicted Clark's testimony. Scogins testified he did not jump on Clark and Clark was not threatened before Clark backed the car out of the parking space. Sutton testified he shot Clark after Clark backed the car out of the parking space. The video recording shows a car quickly backing into an individual standing behind the car, which is consistent with Sutton's testimony he was standing behind the car. Clark testified he was threatened, Sutton placed a gun against his head, and he was shot before he used force to escape.

The evidence is conflicting as to the circumstances surrounding Clark's use of force and whether Clark's use of force in self-defense was justified. The jury's implicit rejection of Clark's self-defense claim is based on its determinations of Scogins's, Sutton's, and Clark's credibility and the weight of their testimony. Clark does not argue or explain why the jury rationally could not have found Scogins's and Sutton's testimony credible. Instead, their testimony is consistent

with the video recording, and Clark's testimony is not. Viewing all of the evidence in the light most favorable to the State and deferring to the jury's credibility determinations, we hold the jury rationally could have found against Clark on his self-defense claim beyond a reasonable doubt. *See Shannon*, 2015 WL 6394922, at *5; *Johnson*, 452 S.W.3d at 403; *see also Gaona*, 2016 WL 3947378, at *3.

THE STATE'S USE OF A PEREMPTORY STRIKE

Clark argues the trial court "violated his right to Equal Protection under the Fourteenth Amendment to the Constitution of the United States and Texas Code of Criminal Procedure Article 35.261, when it failed to order a new array after the State's attorney exercised a peremptory strike to exclude an African-American venire member and did not provide a racially neutral reason for supporting the strike."

**A. Voir Dire Proceedings**

During voir dire, the State asked questions of the entire venire panel and then asked a few questions of the first forty venire members individually. The State's questions generally included a question about whether the venire member could be fair and impartial, follow-up questions from the venire member's responses to the general voir dire questions, and a question about how the venire member would describe himself or herself in one word.

The entire dialogue between the State and venire member 18 during the individual voir dire proceeded as follows:

Q. Hello. How are you?

A. Hi.

Q. Is that mic still working?

A. Yes.

Q. Okay. Good. So, is there anything about your personal situation that you think would prevent you from be[ing] fair and impartial on this jury?

A. No.

Q. No? Any questions for me? You're a little bit quiet. Anything [the other prosecutor] said that you're like, "I don't know about that; is he telling me the truth"?

A. No.

Q. Okay. And I think that you're retired, yes?

A. Yes.

Q. What did you do before you were retired?

A. Well, I was with the U.S. government.

Q. Can you tell us, or is it top secret?

A. I would rather not say.

Q. Now I want to know. So is there anything about your job that maybe you think might keep you from listening to the facts of this case and being fair and impartial?

A. No.

Q. You can be fair today and listen to both sides?

A. Yes.

Q. Thank you. Oh, how about one word to describe yourself?

A. Sensational.

Q. Now I really want to know. Can you tell me after?

Clark objected to the State's use of a peremptory strike on venire member 18. The State explained venire member 18 "never made eye contact," "he was not responsive," and during individual voir dire "he was less than cooperative." The State further explained: "When asked about his job, asked about what he's doing currently, that type of thing, what he has done, we just felt like he wasn't interacting well with us . . . . He just didn't want to tell me what he did. He didn't want to give any

information." The trial court found the State's explanation was acceptable, denied Clark's challenge, and empaneled the jury.

## B. Applicable Law & Standard of Review

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court of the United States held a state violates the Equal Protection Clause when a prosecutor excludes a venire member based on race. *Id.* at 85-86. The Supreme Court established a three-step process for evaluating *Batson* challenges: (1) the defendant must make a prima facie showing of racial discrimination; (2) if the defendant makes that showing, the burden shifts to the prosecutor to articulate a race-neutral reason for the strike; and (3) the trial court must determine if the defendant has proven purposeful discrimination. *Id.* at 96-98; *Nieto v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012). The burden of persuasion never shifts from the defendant. *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999). When a prosecutor offers a race-neutral explanation for the strike, the defendant has "the burden to show that the explanation given was merely a pretext for discrimination." *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002). In assessing the credibility of a prosecutor who offers race-neutral explanations for disparate striking of jurors, the trial court may consider (1) the prosecutor's demeanor, (2) how reasonable or how improbable the explanations are, and (3) whether the proffered rationale has some basis in accepted trial strategy. *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

The Texas Legislature codified *Batson* in article 35.261 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 35.261 (West 2006); *accord Jones v. State*, 833 S.W.2d 118, 122 n.6 (Tex. Crim. App. 1992). Article 35.261 provides:

> (a) After the parties have delivered their lists to the clerk under Article 35.26 of this code and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case. The court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing

the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state to give a racially neutral explanation for the challenges. The burden of persuasion remains with the defendant to establish purposeful discrimination.

(b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.

TEX. CODE CRIM. PROC. ANN. art. 35.261. We therefore consider whether the trial court erred under *Batson* and article 35.261's codification of *Batson* when it failed to order a new array despite Clark's objection to the State's use of a peremptory strike on venire member 18.

When considering whether a trial court errs by overruling a defendant's objection to the State's use of a peremptory strike allegedly based on race, we "examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext." *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). Because the trial court's decision largely turns on its evaluation of credibility, we give the court's decision great deference and will not disturb the court's ruling unless it is clearly erroneous in view of the record as a whole. *Id.*; *Ladd v. State*, 3 S.W.3d 547, 563 (Tex. Crim. App. 1999).

## C. Analysis

The State does not dispute Clark presented a prima facie case but argues it offered race-neutral explanations for using a peremptory strike on venire member 18: he did not make eye contact, he was not responsive to questions, and he was "less than cooperative" when he stated he did not want to tell the State about his prior employment. On appeal, Clark emphasizes the State recognized venire member 18 was "a little bit quiet." He argues the State described several other venire members as "quiet" and did not use peremptory strikes on those jurors. Therefore, Clark reasons, the State's explanation was a pretext for discrimination.

That venire member 18 was "a little bit quiet" was not part of the State's explanation of its peremptory strike. The prosecutor's proffered explanations included the failure to make eye contact, the lack of cooperation, and the lack of a desire to provide the State with information when responding to questions. These proffered explanations are race-neutral. *See Townsend v. State*, 730 S.W.2d 24, 26-27 (Tex. App.—Texarkana 1987, no writ) (holding failure to make eye contact and indefinite answers from a venire member were race-neutral explanations).

Because the prosecutor offered race-neutral explanations for it use of a peremptory strike on venire member 18, Clark had the burden to prove these explanations were a pretext for racial discrimination. *See Johnson*, 68 S.W.3d at 649. Clark argued in the trial court the prosecutor's explanations were a pretext because the prosecutor should have asked the court to instruct the juror to answer the question. Out of the forty venire members who the State questioned individually, venire member 18 was the only one who declined to voluntarily answer a question. Once venire member 18 demonstrated he did not want to answer the prosecutor's questions, the State had a basis in accepted trial strategy not to ask the court to order venire member 18 to answer the question. *See Townsend*, 730 S.W.2d at 26-27. The trial court, which assessed the prosecutor's credibility and demeanor in articulating race-neutral explanations for its use of the peremptory strike, could have believed the prosecutor's race-neutral explanations were not a pretext for racial discrimination. We therefore hold the trial court's overruling of Clark's *Batson* challenge was not clearly erroneous. *See Ladd*, 3 S.W.3d at 563.

## CONCLUSION

We affirm the trial court's judgment.

Luz Elena D. Chapa, Justice

DO NOT PUBLISH